UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAR 31 2016 ★

**BROOKLYN OFFICE**

------------------------------------------------------x

JOTICA TALWAR,

                Plaintiff,

-against-

STATEN ISLAND UNIVERSITY HOSPITAL,
ANTHONY C. FERRERI, and HENRY
SIMPKINS,

                Defendants.

------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
12-CV-33 (CBA)

**AMON, Chief United States District Judge:**

Plaintiff Dr. Jotica Talwar filed this action against defendants Staten Island University Hospital ("SIUH" or the "Hospital"); Anthony C. Ferreri, President and Chief Executive Officer of SIUH; and Dr. Henry Simpkins, Chairman of SIUH's Department of Pathology & Laboratory Medicine, for alleged discrimination and retaliation she suffered as an employee of the Hospital. Dr. Talwar initially asserted claims under 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 et seq.; the Equal Pay Act, 29 U.S.C. § 206(d)(1); the Lilly Ledbetter Fair Pay Act, 42 U.S.C. § 2000e-5(e)(3); New York State Labor Law ("NYLL") § 194; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law. § 290 et seq.; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107(1)(a), (7). (D.E. # 1, Compl.) On June 21, 2013, defendants moved for summary judgment. (D.E. # 29.) This Court granted summary judgment on March 31, 2014, (D.E. # 41), and Dr. Talwar appealed, (D.E. # 43).

On appeal, the Second Circuit affirmed this Court's grant of summary judgment in favor of defendants on Dr. Talwar's federal discrimination and retaliation claims and her equal pay claims under state law. Talwar v. Staten Island Univ. Hosp., 610 F. App'x 28, 31–32 (2d Cir. 2015). The Second Circuit also granted summary judgment in favor of defendants on Dr. Talwar's

NYSHRL claims on the merits and remanded for entry of judgment accordingly. Id. at 31. Because this Court "did not have an opportunity to conduct . . . a 'separate[] and independent[]' analysis" of Dr. Talwar's NYCHLR claims,[1] the Second Circuit vacated in part and remanded those claims for this Court to conduct such an analysis in the first instance. Id. at 31 (quoting Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013)). After a separate and independent analysis of Dr. Talwar's NYCHRL claims, the Court now grants summary judgment in favor of defendants for the reasons stated below.

## BACKGROUND[2]

Dr. Talwar is an Indian national who came to the United States in 1992 to complete her medical training. (Defs.' R. 56.1 ¶ 1; Pl.'s R. 56.1 ¶ 1.) Dr. Talwar met defendant Dr. Henry Simpkins, then Chairman of the Department of Pathology at Temple University Hospital, in 1998, when he interviewed her for a fellowship in his department. (Defs.' R. 56.1 ¶¶ 16–17; Pl.'s R. 56.1 ¶¶ 16–17.) Dr. Talwar obtained the fellowship and served as a fellow from July 1998 to June 1999. (Defs.' R. 56.1 ¶ 18; Pl.'s R. 56.1 ¶ 18.) Dr. Talwar then joined South Shore Pathology, P.C. ("South Shore") as a pathologist with a subspecialty in hematopathology. (Defs.' R. 56.1 ¶ 20; Pl.'s R. 56.1 ¶ 20.) In 2007, SIUH hired many of South Shore's pathologists, including

---

[1] The parties appear to have recognized that the Court incorrectly believed it lacked original jurisdiction over Dr. Talwar's state and city human rights claims. (D.E. # 52, Mot. to Strike, at 2.) Although the Court accepts full responsibility for that error, it is unfortunate that neither party brought the error to its attention prior to the appeal.

[2] The Court includes only those facts relevant to the instant motion, which are drawn from defendants' Rule 56.1 Statement (D.E. # 30, Defs.' R. 56.1), Dr. Talwar's Rule 56.1 Statement, (D.E. # 32, Pl.'s R. 56.1), defendants' counterstatement to Dr. Talwar's Rule 56.1 Statement (D.E. # 35, Defs.' Reply 56.1), and the exhibits thereto (which, in accordance with the Court's Individual Rule 1(e), were only filed by courtesy copy due to their voluminous nature), including: Affirm. of John F. Fullerton III in Supp. of Summary Judgment ("Fullerton Affirm."), Exs. 2–3 ("Talwar Dep."); id., Ex. 6 ("Opitz Dep."); id., Ex. 13 ("Pathology Dep't Chart"); id., Ex. 18 ("July 2009 Talwar Contract"); id., Ex. 19 ("September 2009 Talwar Contract"); Fullerton Reply Affirm., Ex. 35 ("Hurford Contract"); Aff. of Dr. Henry Simpkins ("Simpkins Aff."); Aff. of Dr. Visitacion Pabicon ("Pabicon Aff."); Aff. of Dr. Kokila Mody ("Mody Aff."); D.E. # 33, Decl. of Ann Macadangdang in Opp'n ("Macadangdang Decl."), Ex. A ("Talwar Aff."); id., Ex. B ("Varma Aff."); id., Ex. C; id., Ex. F ("Simpkins Dep."); id., Ex. G ("DiAlto Dep."); id., Ex. BB; id., Ex. FF.

Dr. Talwar. (Defs.' R. 56.1 ¶¶ 25–26; Pl.'s R. 56.1 ¶¶ 25–26.) This action arises from alleged discrimination and retaliation Dr. Talwar experienced while employed by the Hospital.

## A. Dr. Talwar's Immigration Status and Limited License to Practice Medicine

While at South Shore and with assistance from Dr. Simpkins, Dr. Talwar obtained an O-1 visa, an employer-sponsored work authorization for individuals "demonstrat[ing] extraordinary ability by sustained national or international acclaim" who are "coming temporarily to the United States to continue work in the area of extraordinary ability." (Defs.' R. 56.1 ¶¶ 3–4, 19; Pl.'s R. 56.1 ¶¶ 3–4, 19.) O-1 visas are initially granted for three years but may be extended annually on application to and approval by the United States Citizenship and Immigration Services. (Defs.' R. 56.1 ¶ 5; Pl.'s R. 56.1 ¶ 5.) Although the Hospital employed hundreds of non-citizen physicians during Dr. Talwar's time at SIUH, she was the only employee with an O-1 visa. (Defs.' R. 56.1 ¶¶ 55, 126; Pl.'s R. 56.1 ¶¶ 55, 126.)

The Hospital submitted O-1 visa extension applications on Dr. Talwar's behalf in 2007, 2008, and 2009. (Defs.' R. 56.1 ¶ 53; Pl.'s R. 56.1 ¶ 53.) Each year, Dr. Simpkins, who became Chair of SIUH's Pathology Department in December 2006, submitted letters in support of those petitions. (Defs.' R. 56.1 ¶¶ 54, 56; Pl.'s R. 56.1 ¶ 54.) Although Dr. Simpkins submitted a letter on Dr. Talwar's behalf in 2009, he was not comfortable continuing to sponsor her visa because he felt that she no longer qualified for an O-1 visa. (Defs.' R. 56.1 ¶ 56.) In particular, Dr. Simpkins believed it was apparent Dr. Talwar was no longer "temporarily" in the United States, (Defs.' R. 56.1 ¶ 56); indeed, it is undisputed that Dr. Talwar had been in the United States for 17 years, married a U.S. citizen, had three children who were U.S. citizens, was not seeking employment in India, and did not have a career plan that would take her back to India, (Defs.' R. 56.1 ¶ 7; Pl.'s R. 56.1 ¶ 7).

O-1 visa holders may obtain only a limited license to practice medicine in New York. (Defs.' R. 56.1 ¶ 9.) Other than Dr. Talwar, each of the South Shore pathologists hired by SIUH signed one-year employment contracts requiring them to hold "a currently valid and <u>unlimited</u> license and registration to practice medicine in the State of New York." (Defs.' R. 56. 1 ¶¶ 30–31 (emphasis added); Pl.'s R. 56.1 ¶¶ 30–31.) The Hospital was aware that Dr. Talwar held a limited license and permitted her to modify the contract by crossing out "un" in "unlimited." (Defs.' R. 56.1 ¶ 31; Pl.'s R. 56.1 ¶ 31.) This change was initialed by defendant Anthony C. Ferreri, SIUH's President and CEO. (Pl.'s R. 56.1 ¶ 132; Macadangdang Decl. Ex. C at JT 50.)

Until July 21, 2008, limited licenses were valid for a maximum of nine years. (Defs.' R. 56.1 ¶ 10.) In 2008, Dr. Talwar informed SIUH that her limited medical license, issued in September 1999, would expire in September 2008 and that no further extensions were available under the then-current law. (Defs.' R. 56.1 ¶ 39; Pl.'s R. 56.1 ¶ 39.) However, a statutory amendment on July 21, 2008, enabled Dr. Talwar to obtain an additional three-year extension. (Defs.' R. 56.1 ¶¶ 12–13, 44; Pl.'s R. 56.1 ¶¶ 12–13.) Because Dr. Talwar would have lost her ability to practice medicine in New York but for the change of law, the Hospital became concerned that the same situation could arise again if Dr. Talwar continued to practice with a limited license. (Defs.' R. 56.1 ¶¶ 46–47; Talwar Dep. at 137–38, 235, 314; Opitz Dep. 26–28.) Around that time, Dr. Simpkins asked Dr. Talwar what she was doing to pursue permanent residency, and Dr. Talwar informed him she was in the process of obtaining a Green Card. (Defs.' R. 56.1 ¶ 50; Talwar Dep. at 145.) Dr. Talwar also discussed progress on her application for permanent residence with Dr. Lynne Opitz, the Associate Chair of Pathology, more than once between August 2008 and July 2009. (Defs.' R. 56.1 ¶ 52; Talwar Dep. at 149, 412.)

**B. 2008 Pathology Department Salaries**

In 2008, Dr. Talwar's annualized salary was $174,720. (Defs.' R. 56.1 ¶ 62; Pl.'s R. 56.1 ¶ 62.) The 2008 salaries of the other former South Shore pathologists included: Dr. Visitacion Pabicon (female) − $189,280; Dr. Kokila Mody (female) − $185,640; Dr. Monika Wrzolek (female) − $190,575; Dr. Natalysa Khilko (female) − $120,336; and Dr. Guangqiai Xiao (male) − $139,100. (Id.) Although his contract does not appear to have been renewed in 2008, Dr. Emil Petrov (male) was also employed by the Pathology Department in 2007, with an annual salary of $155,000. (Pathology Dep't Chart at JT 33.)

Dr. Simpkins hired several new physicians during 2008 and 2009; to recruit them to SIUH, those physicians were offered higher salaries than those hired from South Shore in 2007.[3] (Defs.' R. 56.1 ¶ 63; Simpkins Aff. ¶ 15.) Those physicians included:

- Dr. Lynne Opitz (female), as Associate Chair of the Pathology Department with a starting salary of $281,000, (Defs.' R. 56.1 ¶¶ 64–65; Pl.'s R. 56.1 ¶¶ 64–65);

- Dr. Bette Lazzaro (female), as an Attending Pathologist with a starting salary of $231,000, (Defs.' R. 56.1 ¶¶ 68–69; Pl.'s R. 56.1 ¶¶ 68–69);

- Dr. Fanyi Kong (male), as an Attending Pathologist with a starting salary of $210,000, (Defs.' R. 56.1 ¶¶ 70–71; Pl.'s R. 56.1 ¶¶ 70–71); and

- Dr. Sandra Aponte-Cipriani (female), as Chief of Cytopathology, with a starting salary of $251,998, (Defs.' R. 56.1 ¶ 77; Pl.'s R. 56.1 ¶ 77).

---

[3] Dr. Talwar purports to dispute this fact by arguing that Dr. Kong did not negotiate his salary. (See Pl.'s R. 56.1 ¶ 63.) Whether Dr. Kong negotiated his salary does not raise an issue of fact as to SIUH's motivation for offering a particular salary.

## C. January and August 2009 Meetings with Dr. Simpkins

In January 2009, after Dr. Talwar learned Dr. Kong's salary was higher than hers, she and another female pathologist, Dr. Pabicon, met with Dr. Simpkins to discuss the salary discrepancy. (Defs.' R. 56.1 ¶¶ 78–80; Pl.'s R. 56.1 ¶¶ 78–80.) It is undisputed that Drs. Talwar and Pabicon did not suggest Dr. Kong's salary was higher because he was a man. (Defs.' R. 56. 1 ¶¶ 81–82; Pl.'s R. 56.1 ¶¶ 81–82.[4]) In fact, the two women never discussed gender as a potential reason Dr. Kong was paid more, even between themselves. (Pabicon Aff. ¶ 5.) According to Dr. Talwar, she told Dr. Simpkins she was upset about Dr. Kong's salary because he was "less qualified and less experienced" than she and Dr. Pabicon. (Defs.' R. 56.1 ¶ 81; Talwar Dep. at 166.)

Dr. Talwar later told two other female pathologists, Drs. Kokila Mody and Monika Wrzolek, about Dr. Kong's salary. (Defs.' R. 56.1 ¶ 84; Pl.'s R. 56.1 ¶ 84.) Dr. Talwar also raised concerns about Dr. Kong's salary to Dr. Opitz at some point in late 2009— again without reference to gender—but did not report the pay disparity to Human Resources or anyone else at the Hospital between January and July 2009. (Defs.' R. 56.1 ¶ 85; Pl.'s R. 56.1 ¶ 85; Opitz Dep. at 42.)

In July 2009, the SIUH pathologists received new annual employment contracts. (Defs.' R. 56.1 ¶ 86; Pl.'s R. 56.1 ¶ 86.) Although Dr. Talwar's annualized salary was raised to $179,961, she was disappointed the increase was not more significant. (Defs.' R. 56.1 ¶ 89; Pl.'s R. 56.1 ¶ 89; July 2009 Talwar Contract.) She and Drs. Pabicon, Mody, and Wrzolek all decided not to sign their 2009 contracts, but did not discuss gender as a potential reason that Dr. Kong's salary was higher than theirs, even among themselves. (Defs.' R. 56.1 ¶¶ 90–91; Pl.'s R. 56.1 ¶¶ 90–91.)

---

[4] Dr. Talwar purports to dispute this fact by citing page 195 of her deposition testimony. (Pl.'s R. 56.1 ¶¶ 81–82.) That page of Dr. Talwar's testimony concerns the August 2009 meeting with Dr. Simpkins, not the January 2009 meeting. (See Talwar Dep. at 195.)

Drs. Talwar, Pabicon, and Mody met with Dr. Simpkins in August 2009 to discuss the disparity between their salaries and Dr. Kong's. (Defs.' R. 56.1 ¶¶ 93–94; Pl.'s R. 56.1 ¶¶ 93–94.) Even on Dr. Talwar's account, gender was not raised with Dr. Simpkins as a potential reason for the disparity; Dr. Talwar testifies only that she said, "It's not fair that Dr. Kong, who is less qualified and less experienced than us makes much more than us." (Defs.' R. 56.1 ¶¶ 92, 95, 96; Pl.'s R. 56.1 ¶ 95; Talwar Dep. at 195, 199–200.) Dr. Talwar purports to dispute this fact by citing page 195 of her deposition testimony, (see Pl.'s R. 56.1 ¶¶ 92, 96), but that page makes no reference whatsoever to gender. In fact, when asked during her deposition whether she ever mentioned Dr. Kong's gender as a basis for the salary disparity, Dr. Talwar testified that she had not:

> Q: Did you say to Dr. Simpkins at that meeting that you believed that Dr. Kong was being paid more than the three of you because you're female and he's male?
> A: It was pretty obvious, and like I said before, we were afraid of him.
> Q: What's obvious?
> A: That Dr. Kong is a male and we're female pathologists.
> Q: . . . Did you say to Dr. Simpkins, "We believe that you are not paying us what you're paying Dr. Kong based on our sex, on our gender"?
> A. No, we didn't say it because we were afraid of him.

(Talwar Dep. at 199–200.) Drs. Pabicon and Mody confirm that gender was never raised at the August 2009 meeting; to the contrary, neither doctor believed Dr. Kong was paid more because he was a man. (Pabicon Aff. ¶¶ 5, 7; Mody Aff. ¶¶ 5, 7.)

### D. Dr. Talwar's September 2009 Revised Employment Contract

By email dated August 27, 2009, Dr. Simpkins instructed SIUH's Human Resource Department to hold and modify Drs. Mody and Talwar's contracts. (Macadangdang Decl. Ex. FF.) Dr. Mody's salary increase was withdrawn due to performance issues, particularly tardiness, which had been brought to her attention when the prior academic year ended. (Simpkins Dep. at 75–76.) Dr. Mody, who is also of Indian national origin, still works at SIUH—as do at least 20

other doctors of Indian nationality as identified by Dr. Talwar.[5] (Defs.' R. 56.1 ¶¶ 120, 124; Pl.'s R. 56.1 ¶¶ 120, 124.)

Dr. Talwar's revised contract, dated September 3, 2009, included a new provision (the "termination clause") permitting the Hospital to terminate Dr. Talwar's employment if she did not obtain an unlimited license to practice medicine in New York by December 31, 2009. (Defs.' R. 56.1 ¶¶ 99, 101; Pl.'s R. 56.1 ¶¶ 99, 101.) Dr. Talwar contacted Susan Browning, the Hospital's Chief of Staff, to ask why the revised contract included the termination clause. (Defs.' R. 56.1 ¶ 105; Pl.'s R. 56.1 ¶ 105.) On October 13, 2009, Dr. Talwar met with Browning, Dr. Simpkins, and Ann Marie Henderson, the Hospital's Deputy General Counsel, to discuss the issue. (Defs.' R. 56.1 ¶ 107; Pl.'s R. 56.1 ¶ 107.) Browning's notes from that meeting state:

> Doctor very upset – indicated being targeted [because] asked about salary a couple weeks back (not true but subsequent review shows she's range in dept). Also she's being discriminated against [because] of visa status – not true but Simpkins did tell her he [can]not sign sponsor papers anymore, [because] she is not critically needed by dept.

(Macadangdang Decl. Ex. BB (emphasis in original).)

After the October 2009 meeting, Dr. Talwar contacted the Hospital's Human Resources Department to speak with Margaret DiAlto, the Hospital's Vice President of Human Resources. (Talwar Dep. at 231.) Because DiAlto was not available, Dr. Talwar "explained . . . the whole situation" to Marie Pesce, who apparently worked in the Human Resources Department:

> I told [Pesce] that in January of 2009 Dr. Pabicon and I went to talk to Dr. Simpkins when we discovered about the pay difference. And when we got our contracts in July, we did not sign the contracts. And then we were asked by Dr. Simpkins why we didn't sign the contract. We explained to him that we expected a higher raise and he said he will do whatever he pleases. And now I have a new contract, with

---

[5] Dr. Seema Varma is another Indian doctor formerly employed by SIUH who specializes in oncology and hematology. While employed by SIUH, Dr. Varma held an "H1-B" visa and a limited license to practice medicine in the State of New York. Dr. Varma states that she was never asked nor given a deadline to convert her limited license to an unlimited one. (Varma Aff. ¶¶ 1–10.)

this termination clause. And I said, "I need some help. There is no way I can get an unlimited license by December 31st of 2009."

(Talwar Dep. at 232.) Pesce indicated that she would consult DiAlto and the next day told Dr. Talwar there was not much Human Resources could do. (Id. at 232–33.) Dr. Talwar ultimately met with DiAlto in January 2010 and told Dialto that "she felt that she was not being paid, as a female, the same as the men who were being paid in the department." (DiAlto Dep. at 71–72.)

After Dr. Talwar failed to obtain an unlimited medical license by December 31, 2009, the Hospital notified her that she would be terminated effective March 30, 2010. (Defs.' R. 56.1 ¶ 117; Pl.'s R. 56.1 ¶ 117.) Dr. Talwar's counsel subsequently sent a letter to the Hospital alleging that she had been constructively terminated due to "discriminatory and retaliatory actions." (Defs.' R. 56.1 ¶ 119; Pl.'s R. 56.1 ¶ 119; Macadangdang Decl. Ex. C. at JT 109.) By letter dated March 16, 2010, SIUH denied Dr. Talwar's allegations and stated, "as required by law, [the Hospital] will pay Dr. Talwar's fare to India. Please provide proof that her ticket has been purchased and paid for." (Macadangdang Decl. Ex. C at JT 111.)

After Dr. Talwar's departure, SIUH hired Dr. Matthew Hurford as a hematopathologist in the Department of Pathology with an annual salary of $210,000. (See Hurford Contract.) Dr. Hurford was to perform 20 hours per week of clinical services and 30 hours per week of administrative services, including a contractually specified list of administrative tasks. (Id.)

## STANDARD OF REVIEW

Summary judgment is appropriate if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008). The Court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue to be tried.

See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The moving party carries the burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. In determining whether the movant has met this burden, the Court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in the non-movant's favor. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). Nevertheless, the nonmoving party cannot rest on speculations, conjecture, or denials and "must set forth specific facts showing that there is a genuine issue for trial." Rubens v. Mason, 527 F.3d 252, 254 (2d Cir. 2008).

Although the substance of discrimination and retaliation claims under the NYCHRL must be construed more broadly than analogous claims under state and federal law, such claims are still subject to the federal summary judgment standard. Mihalik, 715 F.3d at 111–12 (noting that summary judgment remains "an appropriate mechanism for resolving NYCHRL claims" and that although "the New York City Council may provide a different substantive standard to be applied to particular claims in federal court, the same federal procedural rules apply"). "Accordingly, district courts may still grant summary judgment with respect to NYCHRL claims if there is no genuine dispute as to any material fact regarding plaintiff's claim and the employer's affirmative defense." Id.

## DISCUSSION

### I.    Defendants' Motion to Strike Dr. Talwar's Supplemental Exhibits

As an initial matter, the Court resolves a dispute among the parties as to what evidence should be considered in analyzing Dr. Talwar's NYCHRL claims. After the Second Circuit remanded, the Court permitted defendants to supplement their initial summary judgment briefing and gave Dr. Talwar an opportunity to reply. (D.E. # 47 (the "June 15 Order").) Defendants filed a six-page supplemental memorandum, briefly summarizing additional arguments raised on appeal

and relevant caselaw decided after this Court's March 31 Order. (D.E. # 49, Defs.' Suppl. Mem. in Supp. of Summary Judgment ("Defs.' Suppl. Mem.").) Dr. Talwar filed a 12-page reply, accompanied by 22 pages of exhibits (the "supplemental exhibits"). (D.E. # 51, Mem. in Opp. to Defs.' Suppl. Mem. ("Talwar Suppl. Mem."); D.E. # 50, Decl. of Ann Macadangdang in Further Opp'n to Defs.' Mot. for Summary Judgment ("Suppl. Macadangdang Decl.").)

Defendants moved to strike these supplemental exhibits and all related arguments in Dr. Talwar's supplemental brief. (D.E. # 52, Mot. to Strike.) Defendants object primarily to Dr. Talwar's submission of a previously unproduced curriculum vitae and newly obtained affidavit from Dr. Bette Lazzaro, a female physician in the Pathology Department who was paid more than Dr. Kong—a fact central to both this Court's and the Second Circuit's analysis of Dr. Talwar's salary discrimination claims. See Talwar, 610 F. App'x at 31; Talwar v. Staten Island Univ. Hosp., ("Talwar I") No. 12-CV-0033 (CBA) (JMA), 2014 WL 5784626, at *11 (E.D.N.Y. Mar. 31, 2014). Given that Dr. Lazarro now attests that she is not an appropriate comparator for Dr. Kong, it is possible that this evidence—had it been timely presented—may or may not have impacted this Court's (or, for that matter, the Second Circuit's) decision to dismiss those claims.

The supplemental exhibits were not timely introduced, however, and Dr. Talwar's supplemental submissions plainly exceed both the letter and spirit of the Court's June 15 Order. Rather than replying to defendants' supplemental brief, Dr. Talwar attempts to reopen a factual record closed three years ago without seeking or receiving leave from the Court. Dr. Talwar attempts to justify this conduct by arguing that (1) she could not depose Dr. Lazzaro during discovery because defendants failed to disclose Dr. Lazzaro's identity, (Talwar Suppl. Mem. at 3), and (2) Dr. Lazzaro's position became relevant only after summary judgment, (D.E. # 53). Both arguments are without any merit.

Dr. Talwar clearly knew the "identity" of Dr. Lazzaro—her coworker—well before this litigation. Moreover, Dr. Lazzaro's name, title, and salary were repeatedly produced in documents and discussed in depositions throughout discovery. (Mot. to Strike at 2; see also, e.g., Pathology Dep't Chart; Fullerton Affirm. Ex. 27 (Dr. Lazzaro's contract); Macadangdang Decl. Ex. MM (chart listing Pathology Department salaries).) And given that Dr. Talwar claims female pathologists were paid less than their male counterparts, Dr. Lazzaro's position as a female pathologist who was paid more than her male colleagues has always been relevant. Whether Dr. Talwar initially overlooked Dr. Lazzaro's salary or simply chose to ignore it until this Court and the Second Circuit confirmed its significance, the only thing that prevented Dr. Talwar from deposing Dr. Lazarro during discovery was her own failure to anticipate defendants' ultimately successful summary judgment strategy.

In any event, the Court agrees with defendants that it is Dr. Talwar—not defendants—who improperly failed to disclose Dr. Lazzaro. (Mot. to Strike at 2.) The only information about Dr. Lazzaro employed by defendants in the first round of summary judgment briefing was her title and salary—information to which all parties had access. By contrast, only Dr. Talwar had knowledge of the evidence she now seeks to introduce: that Dr. Lazzaro does not consider herself an appropriate comparator for Dr. Kong and that Dr. Talwar discussed her concerns about gender-based salary discrimination with Dr. Lazzaro. (See Suppl. Macadangdang Decl. Ex. A ¶¶ 7–10.) These facts could not have been known to anyone other than Drs. Talwar and Lazzaro. It is thus Dr. Talwar who should have disclosed Dr. Lazzaro as a party likely to have discoverable information under Federal Rule of Civil Procedure 26(a)(1)(A)(i).

Federal Rule of Civil Procedure Rule 37(c)(1) provides that a party who, "without substantial justification," fails to disclose required information "is not, unless such failure is

harmless, permitted to use" that information as evidence. Dr. Talwar has provided no justification for failing to disclose that she discussed gender-based pay discrimination with Dr. Lazzaro. That omission cannot possibly be considered harmless given that (1) defendants were wholly unaware of the scope of Dr. Lazzaro's knowledge and had no opportunity to depose her, cf. Bonnano v. Verizon New York, Inc., No. 06 Civ. 6671 (DAB), 2011 WL 832855, at *1 n.2 (S.D.N.Y. Mar. 4, 2011) (concluding that failure to disclose certain evidence was harmless because the adverse party "was well aware of the identity of the disclosed witness and the scope of their knowledge" (internal quotation marks and citation omitted)), and (2) the proffered evidence would meaningfully alter the essential facts upon which this Court and the Second Circuit relied in adjudicating Dr. Talwar's federal and state discrimination and equal pay claims, cf. CSC Holdings, Inc. v. Berube, No. 01-CV-1650 (DRH) (MLO), 2004 WL 3541331, at *3 (E.D.N.Y. July 7, 2004) (concluding that failure to disclose a witness was harmless where the proffered testimony did not "contradict or alter the essential facts of the case"). Because Dr. Talwar herself failed to disclose Dr. Lazzaro as a person likely to have discoverable information and has not explained that highly prejudicial omission, Rule 37(c)(1) precludes Dr. Talwar from relying on the newly submitted affidavit and curriculum vitae of Dr. Lazzaro, (Suppl. Macadangdang Decl. Exs. A, D).

Neither party specifically addresses Dr. Talwar's supplemental Exhibits B and C—a copy of defendants' initial disclosures and Dr. Kong's curriculum vitae, respectively. These exhibits are not relevant to Dr. Talwar's claims: Dr. Talwar relies on Exhibit B only to illustrate that defendants failed to include Dr. Lazzaro in their initial disclosures—a fact that is not disputed and is offered only to support an argument already considered and rejected—and does not even cite Exhibit C in her supplemental brief. Given that these exhibits are not relevant to the merits and Dr. Talwar offers no justification for submitting them without leave of the Court, defendants'

motion to strike is also granted with respect to Exhibits B and C. The Court therefore disregards the Supplemental Declaration of Dr. Talwar's counsel, all exhibits thereto, and all arguments based on that evidence in adjudicating Dr. Talwar's NYCHRL claims.

## II.    Dr. Talwar's NYCHRL Claims

Dr. Talwar claims that defendants violated the NYCHRL by discriminating against her on the basis of national origin and gender and retaliating against her for raising concerns about Dr. Kong's salary.[6]  (D.E. # 19, Am. Compl. ¶¶ 73–86.)  Claims for discrimination and retaliation under the NYCHRL are reviewed "independently from and more liberally than their federal and state counterparts." Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009). Courts reviewing such claims must consider the "totality of the circumstances," and "even a single comment may be actionable in the proper context." Mihalik, 715 F.3d at 113. The Second Circuit has cautioned that "the NYCHRL is not a general civility code," however, and "[t]he plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive." Id. at 110, 113. Thus, "a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory or retaliatory motives." Id. at 113. Defendants argue that they are entitled to summary judgment even under this liberal standard because Dr. Talwar has not adduced sufficient evidence for a jury to reasonably conclude that their conduct was motivated even in part by discriminatory or retaliatory intent. For the reasons stated below, the Court agrees and grants summary judgment accordingly.

### A.  NYCHRL Discrimination Claims

The NYCHRL makes it "an unlawful discriminatory practice" for an employer "to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against

---

[6] Although Dr. Talwar asserted claims arising from alleged alienage discrimination under 42 U.S.C. § 1981, (see Compl. ¶¶ 81–84), she has never raised claims for alienage discrimination under the NYCHRL.

such person in compensation or in terms conditions or privileges of employment" "because of" a protected characteristic, such as national origin or gender. N.Y.C. Admin. Code § 8-107(1)(a). To state a claim for discrimination under this provision, a plaintiff "need only show that her employer treated her less well, at least in part for a discriminatory reason." Mihalik, 715 F.3d at 110 n.8; see also Weber v. City of New York, 973 F. Supp. 2d 227, 262 (E.D.N.Y. 2013). "The employer may present evidence of its legitimate non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes as a matter of law that discrimination played no role."[7] Mihalik, 715 F.3d at 110 n.8.

A plaintiff can challenge a defendant's nondiscriminatory reason by "present[ing] evidence of pretext [or] independent evidence of the existence of an improper discriminatory motive." Bennett v. Health Mgmt. Sys., Inc., 936 N.Y.S.2d 112, 121 (1st Dep't 2011). Alternatively, a plaintiff may leave the nondiscriminatory reason unchallenged and "instead seek only to show that discrimination was just one of the motivations for the conduct" by direct or circumstantial evidence. Id. Although all of these evidentiary routes are available under the NYCHRL, "the burden of persuasion of the ultimate issue of discrimination always remains with the plaintiff." Melman v. Montefiore Med. Ctr., 946 N.Y.S.2d 27, 31 (1st Dep't 2012) (internal quotation marks and citations omitted).

Dr. Talwar claims that defendants treated her less well because of her national origin and gender in violation of the NYCHRL. Specifically, Dr. Talwar contends that defendants modified

---

[7] At first blush, this inquiry parallels to a certain extent the McDonnell Douglas burden-shifting framework courts apply in adjudicating federal and state employment discrimination claims. The Second Circuit has questioned the continued applicability of that framework in the context of NYCHRL claims, however, and has advised that federal district courts instead engage in the "simplified . . . discrimination inquiry" the Court employs here—namely, determining whether "the record establishes as a matter of law that discrimination played no role." See Mihalik, 715 F.3d at 110 n.8; see also Weber, 973 F. Supp. 2d at 262–63 (explaining that the Second Circuit clarified the inquiry for NYCHRL disparate treatment claims in Mihalik).

her employment contract in September 2009 because she is Indian and compensated her less well because she is a woman. (See D.E. # 34, Talwar's Mem. in Opp. to Summary Judgment ("Talwar Mem.") at 34–39.) Defendants argue that Dr. Talwar has not adduced any evidence showing that either decision was motivated even in part by discriminatory animus. (See Defs.' Mem. at 12–14, 31–32; Defs.' Suppl. Mem. at 3–4.) Viewing the record in the light most favorable to Dr. Talwar and applying the liberal standard for NYCHRL claims, the Court agrees.

### 1. National Origin Discrimination

Dr. Talwar purports to offer both direct and circumstantial evidence that her contract was modified at least in part because of her national origin. First, Dr. Talwar claims that the letter in which SIUH "demanded proof of '[her] fare to India'" is direct evidence of animus toward her Indian national origin. (Talwar Mem. at 36; Talwar Suppl. Mem. at 11.) Second, Dr. Talwar attempts to raise an inference of discriminatory animus from circumstantial evidence that Indian doctors were treated less favorably than similarly situated non-Indian doctors: although four pathologists refused to sign their 2009–2010 contracts—Drs. Talwar, Mody, Wzolek, and Pabicon—defendants subsequently modified the contracts of the two Indian doctors (Drs. Talwar and Mody) but not of the two non-Indian doctors (Drs. Wzolek and Pabicon). (Talwar Mem. at 35–36; Talwar Suppl. Mem. at 12.) As explained in Talwar I, neither of these facts raises an inference of discrimination on the basis of national origin, 2014 WL 5784626, at *8, a conclusion the Second Circuit also reached in affirming this Court's grant of summary judgment on Dr. Talwar's federal national origin discrimination claims, Talwar, 610 F. App'x at 29–30.

This remains true even under the more liberal standard of the NYCHRL. The letter referring to Dr. Talwar's "fare to India" is neither direct nor circumstantial evidence of animus toward Indians. The letter makes plain that proof of Dr. Talwar's fare is being requested solely to

facilitate reimbursement the Hospital is required to provide by law. (See Macadangdang Decl. Ex. C at JT 111.) Moreover, the letter was sent months after Dr. Talwar's contract was modified. Given this timing and the absence of any language or comment that is at all probative of animus, no reasonable jury could conclude that defendants modified Dr. Talwar's contract because she is Indian based on this letter. With respect to the modification of Dr. Mody's contract, the undisputed evidence shows that Dr. Mody's salary increase was withdrawn due to performance and tardiness issues discussed with Dr. Mody well in advance of the meeting with Dr. Simpkins. (See Defs.' Reply at 7–8; Simpkins Dep. at 75–76.) Dr. Talwar has not produced any evidence to rebut this nondiscriminatory reason, nor can she point to any other evidence in the record, circumstantial or otherwise, showing that this reason is pretext.

Dr. Talwar never heard defendants or anyone else at the Hospital make discriminatory or negative comments about Indian nationals. (See Defs.' R. 56.1 ¶ 127; Pl.'s R. 56.1 ¶ 127.[8]) Moreover, Dr. Talwar herself identified at least 20 other doctors of Indian national origin employed by the Hospital, including Dr. Mody, who continues to work in the Pathology Department. (Defs.' R. 56.1 ¶¶ 120, 124; Pl.'s R. 56.1 ¶¶ 120, 124.) Dr. Talwar's claims are further undercut by the fact that she and Dr. Simpkins have had a professional relationship since 1998, when Dr. Simpkins interviewed Dr. Talwar for a fellowship in a department he chaired that she ultimately obtained and completed. (Defs.' R. 56.1 ¶¶ 16–18; Pl.'s R. 56.1 ¶¶ 16–18.) Dr. Simpkins then helped Dr. Talwar obtain an O-1 visa so that she could work at South Shore and continued writing letters in support of her visa applications after she once again became his colleague at SIUH. (Defs.' R. 56.1 ¶¶ 19, 54, 56; Pl.'s R. 56.1 ¶¶ 19, 54, 56.) Dr. Talwar concedes

---

[8] Although Dr. Talwar purports to dispute this fact, she does so only by citing the March 16 letter that referred to reimbursement of her fare to India. (See Pl.'s R. 56.1 ¶ 127.) As noted above, this letter contains no discriminatory or negative remarks or comments about Indian nationals.

that, at least as of 2007, she and Dr. Simpkins had a "mutual respect for each other." (Pl.'s R. 56.1 ¶ 35.) Viewing all of these facts in the light most favorable to Dr. Talwar, even under the more liberal standard of the NYCHRL, no reasonable jury could conclude that Dr. Talwar was treated less well because of her Indian national origin and summary judgment is therefore warranted. See Mihalik, 715 F.3d at 112 ("[D]istrict courts may still grant summary judgment with respect to NYCHRL claims if there is no genuine dispute as to any material fact regarding plaintiff's claim and the employer's affirmative defense.").

### 2. Gender Discrimination

Dr. Talwar has similarly failed to raise a triable issue as to whether she was compensated less well, even in part, because she is a woman. "[A]n employee bringing a claim for unlawful discrimination in compensation must show that 'he is a member of a protected class and . . . was paid less well than similarly situated nonmembers of the class.'" Melman, 946 N.Y.S.2d at 31 n.2. To establish that defendants paid her less well because she was a woman, Dr. Talwar argues that she was paid less than similarly situated male pathologists. (See Talwar Mem. at 36–38; Talwar Suppl. Mem. at 9–10.) She also notes that Dr. Hurford—the male pathologist that replaced her— was offered a higher salary than she was being paid at the time of her termination. (See Talwar Mem. at 38; Talwar Suppl. Mem. at 10.)

As explained in Talwar I, Dr. Talwar has not established that she was paid less well than similarly situated male attending pathologists at SIUH, 2014 WL 5784626, at *11—a conclusion the Second Circuit also reached in affirming this Court's grant of summary judgment on Dr. Talwar's federal and state gender-based pay discrimination claims, Talwar, 610 F. App'x at 30– 31. As the Second Circuit explained: "[M]ale attending pathologists were not, as a group, paid more than female attending pathologists. Two male attending pathologists on staff in 2007 and

2008—Dr. Petrov and Dr. Xiao—earned substantially less than Dr. Talwar, and even Dr. Kong, who was hired in 2008 and was paid more than Dr. Talwar, was paid less than another female attending pathologist, Dr. Lazarro." Id. The fact that Dr. Hurford's salary was higher than Dr. Talwar's does not raise an inference of gender-based salary discrimination for the same reason:[9] Dr. Talwar may have been paid less than Drs. Kong and Hurford, but she earned, in the words of the Second Circuit, "substantially" more than two other similarly situated male pathologists.

Viewing the record in the light most favorable to Dr. Talwar, no reasonable jury could conclude from these facts that Dr. Talwar was compensated less well than similarly situated male pathologists. See Herrington v. Metro-North Commuter R.R. Co., 988 N.Y.S.2d 581, 582–83 (1st Dep't 2014) (holding that plaintiff who alleged gender discrimination based on disparate pay under the NYCHRL failed to state a claim because "she was paid $5,000 more than two male assistant vice presidents . . . but was paid $5,000 less than the man who replaced one of [those] men" and had therefore "failed to allege that she was paid less than similarly[] situated male counterparts, as two of the three male assistant vice presidents were paid less than she was."). Defendants are therefore entitled to summary judgment on Dr. Talwar's gender discrimination claim. See Mihalik, 715 F.3d at 112.

### B. NYCHRL Retaliation Claim

Dr. Talwar also claims that defendants retaliated against her for opposing the Hospital's allegedly discriminatory pay practices. Section 8-107(7) of the NYCHRL prohibits employers from "retaliat[ing] or discriminat[ing] in any manner against any person because such person has

---

[9] In any event, the Hospital argues that Dr. Hurford is not an appropriate comparator for Dr. Talwar because he had "different and significantly greater" job responsibilities than did Dr. Talwar. (Defs.' Reply at 15.) Specifically, "Dr. Hurford was hired to perform only 20 hours per week of clinical services (instead of 40), and 30 hours per week of administrative services," and his responsibilities included "a host of additional duties" Dr. Talwar did not have. (Id.; compare Hurford Contract at 1978–88 (listing Hurford's responsibilities), with September 2009 Talwar Contract at 1104–05 (listing Dr. Talwar's responsibilities).) Dr. Talwar does not acknowledge or address these significant differences between Dr. Hurford's responsibilities and hers anywhere in her papers.

. . . opposed any practice forbidden under this chapter." N.Y.C. Admin. Code § 8-107(7). To state a claim for retaliation under the NYCHRL, a plaintiff must prove that: "(1) she engaged in a protected activity; (2) her employer was aware that she participated in such activity; (3) she suffered an action that would be reasonably likely to deter a person from engaging in the protected activity; and (4) there is a causal connection between the protected activity and the adverse action." Roberts v. United Parcel Serv., Inc., 115 F. Supp. 3d 344 (E.D.N.Y. 2015); Forrest v. Jewish Guild for the Blind, 3 N.Y.3d 295, 312, 819 (2004) (same). Defendants argue that (1) Dr. Talwar did not engage in a protected activity before the September 2009 contract modification, and (2) that she cannot show a causal link between any subsequent protected activity and an action that would be reasonably likely to deter a person from engaging in that protected activity. (Defs.' Mem. at 22–26; Defs.' Reply at 11–12; Defs.' Suppl. Mem. at 4–5.) The Court agrees.

### 1. Protected Activity

Dr. Talwar has identified five potential instances of protected activity: her complaints about Dr. Kong's salary at the January 2009 and August 2009 meetings with Dr. Simpkins; her allegation that she was being retaliated against for complaining about Dr. Kong's salary and discriminated against because of her visa status at the October 2009 meeting; her conversation with Pesce in October 2009; and her meeting with DiAlto in January 2010.

Dr. Talwar did not engage in protected activity at the January and August 2009 meetings with Dr. Simpkins. By her own account, Dr. Talwar did not attribute the pay disparity to gender discrimination at either meeting. (See Talwar Dep. at 166–67, 171, 199–200.) Indeed, it is undisputed that the four female pathologists who refused to sign their 2009 contracts never discussed gender as a reason for the disparity in Dr. Kong's salary, even among themselves. (Defs.' R. 56.1 ¶ 91; Pl.'s R. 56.1 ¶ 91.) Dr. Talwar instead appears to have ascribed her complaint

to the fact that Dr. Kong was "less qualified and less experienced." (Defs.' R. 56.1 ¶ 92; Pl.'s R. 56.1 ¶ 92; Talwar Dep. at 166, 195.)

Dr. Talwar argues that although she did not use the word "discrimination" or explicitly refer to gender at those meetings, she engaged in protected activity by naming Dr. Kong, a male pathologist, and complaining that his salary was "not fair." (Talwar Suppl. Mem. at 5.) Dr. Talwar appears to contend that she implicitly raised the specter of gender discrimination because she was a woman complaining about a man's salary. But the mere fact that Dr. Talwar and the other female pathologists complained about a man's salary does not convert their complaint into an allegation of discrimination. See Rommage v. MTA Long Island Rail Rd., No. 08-CV-836 (DLI) (ALC), 2010 WL 4038754, at *14 (E.D.N.Y. Sept. 30, 2010) aff'd, 452 F. App'x 70 (2d Cir. 2012) (granting summary judgment on federal, state, and NYCHRL retaliation claims after concluding that "the mere fact that the person or people making the complaints were African American will not convert an ordinary complaint into a complaint of racial discrimination sufficient to put the employer on notice of such discrimination" (internal quotation marks and citation omitted)).

Although Dr. Talwar was not required to "mention discrimination or use particular language," Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007), a complaint "must in some way allege unlawful discrimination," Malena v. Victoria's Secret Direct, LLC, 886 F. Supp. 2d 349, 363 (S.D.N.Y. 2012), to "put the employer on notice that discrimination . . . is occurring," Ramos v. City of New York, No. 96 Civ. 3787 (DLC), 1997 WL 410493, at *3 (S.D.N.Y. July 22, 1997). "[A]mbiguous complaints that do not make the employer aware of the alleged discriminatory misconduct do not constitute protected activity." Int'l Healthcare Exch., 470 F. Supp. 2d at 357. No reasonable jury could conclude that Dr. Talwar's generic complaints of unfairness at the January and August 2009 meetings were sufficient

to put the Hospital on notice that she was complaining about discrimination. See Ramos, 1997 WL 410493, at \*3 (granting summary judgment on federal, state, and NYCHRL retaliation claims because complaint that supervisor was "treating [plaintiff] unfairly" did not put employer on notice of perceived race discrimination); see also Farzan v. Wells Fargo Bank, N.A., No. 12 Civ. 1217 (RJS) (JLC), 2013 WL 6231615, at \*29 (S.D.N.Y. Dec. 2, 2013) aff'd sub nom., Farzan v. Genesis 10, 619 F. App'x 15 (2d Cir. 2015) (granting summary judgment on federal, state, and NYCHRL retaliation claims because plaintiff's threat to file a "discrimination complaint" did not adequately put employer on notice that plaintiff was complaining about discrimination because of race). The Court therefore concludes that Dr. Talwar did not engage in protected activity at the August and January 2009 meetings with Dr. Simpkins.

There is likewise no evidence that Dr. Talwar engaged in protected activity by alleging gender discrimination at the October 2009 meeting or in her conversation with Pesce soon after. Browning's notes from the October 2009 meeting state that Dr. Talwar felt she was "being targeted" because she "asked about salary," but do not given any indication that Dr. Talwar suggested she was being targeted for asserting a gender-based salary complaint. (Macadangdang Decl. Ex. BB.) Similarly, although Dr. Talwar informed Pesce that she had complained about Dr. Kong's higher salary, by her own account, she did not mention gender as a basis for that disparity.[10] (Talwar Dep. at 232.) Dr. Talwar therefore did not engage in protected activity by complaining about gender discrimination at these meetings.

By contrast, Dr. Talwar explicitly alleged that she was being discriminated against on the basis of visa status at the October 2009 meeting attended by the Hospital's Chief of Staff, Deputy

---

[10] To the extent Dr. Talwar's affidavit suggests she may have raised concerns about discrimination and retaliation in her conversation with Pesce, (see Talwar Aff. ¶ 44), Dr. Talwar's own account of that conversation at her deposition, reprised above, does not include any reference whatsoever to discrimination or retaliation and she expressly testified that she had given a full account of what she said to Pesce. (Talwar Dep. at 233.)

General Counsel, and Dr. Simpkins. (Macadangdang Decl. Ex. BB.) She also explicitly complained that she was paid less because she was a woman in her January 2010 meeting with DiAlto, the Vice President of Human Resources. (DiAlto Dep. at 71–72.) Dr. Talwar plainly engaged in protected activity on these two occasions and the Hospital knew it. And defendants do not dispute that Dr. Talwar suffered an action reasonably likely to deter a person from engaging in protected activity. Accordingly, all that remains is for the Court to determine whether Dr. Talwar has raised a triable issue as to the existence of a causal relationship between an adverse action and these protected activities.

### 2. Causal Connection Between Protected Activity and an Employment Action Reasonably Likely To Deter a Person from Engaging in Protected Activity

Although there is no direct evidence of retaliatory animus in this case, Dr. Talwar contends that a causal connection may be inferred because (1) she suffered "a series of retaliatory actions" in close temporal proximity to her protected activities, and (2) she was treated differently than a similarly situated Indian doctor, Dr. Seema Varma, who did not engage in protected activity and was not given a deadline by which she needed to convert her limited license into an unlimited one. (Talwar Mem. at 42–44.) The requisite causal relationship can be inferred from evidence "that the retaliatory conduct occurred close in time to the protected activities" or evidence showing "disparate treatment of similarly situated employees." Dudley v. N.Y.C. Hous. Auth., No. 12 Civ. 2771 (PGG), 2014 WL 5003799, at *25–26 (S.D.N.Y. Sept. 30, 2014) (internal quotation marks and citation omitted). Dr. Talwar has not presented sufficient evidence to forestall summary judgment under either theory.

Dr. Talwar cannot raise an inference of retaliation based on temporal proximity because the October 2009 and January 2010 meetings took place after defendants revised her contract to add the termination clause. See Farzan, 2013 WL 6231615, at *29 (granting summary judgment

on federal, state, and NYCHRL retaliation claims in part because the protected activity occurred after the adverse employment action). Dr. Talwar attempts to escape this conclusion by claiming that defendants engaged in a "series" of adverse actions culminating in her "constructive termination" in March 2010.[11] (Talwar Mem. at 42; Talwar Suppl. Mem. at 7.) The Court agrees that Dr. Talwar's eventual "termination" resulted from a series of events put in motion by the September 2009 contract modification, but that fact does not compel the legal conclusion Dr. Talwar advances.

"[A]n employer's continuation of a course of conduct that had begun before the employee complained does not constitute retaliation because, in that situation, there is no causal connection between the employee's protected activity and the employer's challenged conduct." Melman, 946 N.Y.S.2d at 42 (citing Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001)); see also Slattery v. Swiss Reins. Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."). Here, the undisputed evidence shows that defendants modified Dr. Talwar's contract to include the termination clause well before she complained of alienage discrimination at the October 2009 meeting or levied her first allegation of gender discrimination in the January 2010 discussion with DiAlto. The fact that defendants ultimately exercised their rights under that clause by notifying Dr. Talwar that she would be terminated in March 2010 for failing to obtain an unlimited license

---

[11] In so arguing, Dr. Talwar appears to contend that the "revocation of . . . support" for her O-1 visa was one such adverse action. To support this contention, Dr. Talwar points to Browning's notes from the October 2009 meeting, which indicate that Dr. Simpkins told Dr. Talwar he was not comfortable writing letters of support on her behalf in the future. Those notes do not indicate when this conversation occurred, (Macadangdang Decl. Ex. BB), and do not establish that the Hospital "revoke[d]" its support for Dr. Talwar's visa; to the contrary, it is undisputed that SIUH supported Dr. Talwar's annual application to renew her visa in July 2009. (Defs.' R. 56.1 ¶ 53; Pl.'s R. 56.1 ¶ 53; see also Talwar Dep. at 315–16.) Moreover, Dr. Talwar herself testified that she was never told the July 2009 letter of support would be last one from the Hospital. (Talwar Dep. at 316.)

is therefore "not proof of retaliation, because it is clear that [defendants were] 'proceeding along lines previously contemplated.'" White v. Pacifica Found., 973 F. Supp. 2d 363, 385 (S.D.N.Y. 2013) (quoting Breeden, 532 U.S. at 272)); see also Dudley, 2014 WL 5003799, at *30 (concluding that plaintiff had not raised an inference of retaliation under the NYCHRL where defendants decided to take alleged retaliatory actions months prior to protected activity); Melman, 946 N.Y.S.2d at 42–43 (affirming dismissal of NYCHRL retaliation claim where the alleged retaliatory conduct was "chiefly [defendant's] continuing the policies . . . that had prompted [plaintiff] to complain in the first place"). Therefore, no reasonable jury could infer retaliatory animus based on the temporal proximity between Dr. Talwar's protected activities and any of the adverse employment actions she experienced.

Dr. Talwar likewise cannot raise an inference of retaliation based on disparate treatment. She attempts to do by offering the affidavit of Dr. Seema Varma, a physician specializing in oncology and hematology formerly employed by the Hospital. Dr. Varma attests that while employed by SIUH, she held an "H1-B" visa and a limited license to practice medicine in the State of New York. Dr. Varma states that she was never asked nor required to convert her limited license to an unlimited one. (Varma Aff. ¶¶ 1–10.) Defendants respond that Dr. Varma is not an appropriate comparator. (Defs.' Reply at 12–13.) The Court agrees. Dr. Varma was employed by an entirely different department, supervised by different decisionmakers, held a different visa, and had not previously almost lost her license to practice medicine on very short notice. In light of these distinctions, no rational jury could infer retaliatory animus by comparing Dr. Talwar's experience to Dr. Varma's. See, e.g., Smith v. Xerox Corp., 196 F.3d 358, 370–71 (2d Cir. 1999), overruled on other grounds by Meacham v. Knolls Atomic Power Lab., 461 F.3d 134 (2d Cir.

2006) ("[O]nly a comparison between persons evaluated by the same decision-maker is probative of discrimination.").

Even under the liberal standard of the NYCHRL, Dr. Talwar has thus failed to raise a triable issue as to whether defendants' actions were caused, even in part, by retaliatory animus. The Court therefore grants summary judgment to defendants. See Mihalik, 715 F.3d at 112.

## CONCLUSION

For the reasons stated above, the Court grants summary judgment in favor of defendants on Dr. Talwar's NYCHRL claims. The Clerk of Court is directed to enter judgment accordingly and close the case.

SO ORDERED.

Dated: March 30 , 2016
   Brooklyn, New York

s/Carol Bagley Amon

Carol Bagley Amon
Chief United States District Judge